Good morning. Verna Weefald on behalf of Michael Panella, the appellant. The issue I want to address this morning is the issue regarding the jailhouse informants and whether or not Mr. Panella was entitled to an evidentiary hearing in the district court. And I say this after Harrington v. Richter and Penn-Hulster. I believe that despite those two cases, he is still entitled, was entitled to an evidentiary hearing. And I think the first issue is would, we have to look at in terms of the allegations, would fair-minded and reasonable jurists have agreed that he was, that the state court's decision was objectively unreasonable, and it clearly was. What we have in this case here is a weak circumstantial evidence. In the middle of the trial, we have a number of jailhouse informants who surfaced, and their testimony was clearly material. The two witnesses, Panella. Wasn't there conflict in testimony from jailhouse informants? I'm sorry, Your Honor. Wasn't there conflict in testimony from jailhouse informants? Well, the testimony was clearly material. Yes, I understand that. But wasn't there conflict in testimony from jailhouse informants? There was. And the jury could choose to believe which of that testimony it found most credible. That's true, too, isn't it? Your Honor, there were witnesses who testified on behalf of the defense that they did not hear the confessions testified to, particularly by Mr. Boreson and Ms. Hawkes. But as the United States Supreme Court has said in Kiles v. Whitley and time and again, the fact that these witnesses were impeached does not show the assault that was warranted based upon the evidence that came to light post-conviction. And I think the important thing to understand is that when Boreson and Hawkes testified, they testified they were not getting any deals for their testimony. And the prosecutor emphasized in closing argument that the reason that you could believe them was because they were not getting anything for their testimony. And that was clearly not true. Counsel, where's the evidence? Because I didn't see this in the briefing. My understanding is it's an argument from inference. But where is the evidence that they – is there any specific evidence that they did get a promise of leniency? Because the mere fact that a prosecutor goes to a sentencing and says, you know, so-and-so's testimony helped us in another case, that doesn't at least strike me as one judge as sufficient to prove there was an agreement to do that. I think that we have to sit back and ask ourselves as fair-minded and reasonable individuals, what do we really think is going on here? We have the prosecutor who appears before the sentencing and says, I did not promise this individual anything. But she agrees that the testimony is important to a conviction of Mr. Piniella. She agreed that – or she did not disagree when Mr. Boreson's attorney said without Mr. Boreson's testimony, Piniella would have been acquitted. And she also said that, you know, they could consider his testimony for whatever the court wanted to do. Right, but the prosecutor and the informants, I thought both gave some testimony that there was no deal. And presumably they could have been cross-examined and a jury could believe them or not. Well, I believe that it's a question of this whole idea of this winking and nodding. And I think I would also point to the Carrera v. Brown case, which came out of the Eastern District, and which is also a case out of Kern County. And the informants, the prosecutor and the informants, denied they were getting any benefits for the testimony. And as soon as they get off the witness stand, their lawyers go about seeking benefits because they testified against this individual. The informants got benefits, as did Mr. Boreson. And then the – that case, there were – there was discovery, there were depositions taken, and the lawyer for the informant in that case said, no, I did not specifically ask for a deal, because in Kern County, you don't have to. It's understood that the informant is going to get a deal. And that is exactly what happened here. And I would also remind the Court about Judge Trott's concurring opinion in Wilhoyt v. Vasquez, in which they condemned the winking and nodding that was going on. And in that particular case, the Court did not grant relief on grounds of the harmless error, but the judge, Judge Trott, said it was, if we allow this to go on, it will become internalized. And that's what's happened here. I think our colleagues' views on that are well-known and well-articulated. But in this particular case, you're asking us to assume a wink and a nod where there's no evidence, either from the prosecution or from the other – the defense lawyers or the defendants in the other cases, the jailhouse informants, that, in fact, there was a deal. Is there any Supreme Court law that you can cite us to that would allow us to make that leap of faith? I think that certainly the Supreme Court law says that they have to disclose the deal. But I think that – They only have to disclose it if there is a deal, right? But look – there's no Supreme Court case that said that the deal must be verbal, it must be explicit. So you're saying that custom and practice is enough? I think in this particular case, certainly, given what happened. Aren't we dealing here, though, with an expectation of a deal? Isn't that the premise of your argument, that since there's no direct evidence of a deal, none that is at least evident for the records based on an inference, aren't you approaching it from the fact that these witnesses had an expectation of a deal? Is that your point? Well, that is definitely part of the point I'm trying to make. Certainly, they have – Right. Now, is there a Supreme Court case that says an expectation of a deal would be sufficient? I believe that that expectation is subsumed and part and parcel of the Giglio, Bradio, Kyles v. Whitley line of cases. So the prosecution has to come to the defense counsel and say, you know, we think that this witness might have an expectation of a deal. We didn't tell him, but he has an expectation of a deal. And since he has an expectation of a deal, I have to disclose what this witness's expectation is. So we have prosecutor as mind reader. I certainly think that the prosecution in this case and in Kern County has an obligation to disclose to the jury that we don't need to sit down in the back room and – or on a piece of paper or have explicit deals, because, ladies and gentlemen, if you get up and testify against somebody and you're a jailhouse informant, you're going to get something for that testimony. You will. And we don't have to say it on the record, because everybody knows what's going on. The only person that doesn't – or only people that don't know what's going on is the jury. Counsel, could I interject a clarifying question? I think in your argument you just said that the prosecution had an obligation to disclose this to the jury. I thought from your briefs you were saying that they had to disclose under Brady to the defendant. Well, yes. Not to the jury. Is there any case saying they have to – like the prosecutor's got to stand up in court and give a little speech to the jury, along the lines you're saying? No. I think what I am saying, of course the prosecution has to disclose it to the defense, but – and so that the defense can use it as impeachment. But the issue is everybody in this courtroom knew what was going on but the jury. The whole point is what the jury is ultimately going to hear. The jury is told during closing argument that there's no deal, and that's why you can believe them. But ultimately all the circumstantial evidence points to the fact that there clearly was a deal. The prosecutor understood that the informant would be rewarded for his testimony. You know you're asking us to make new law, right? Yes. No question. Why don't you think about that while the State comes and tells us what it thinks. I will think about that. Or the government, rather. Good morning, Your Honors. I may have pleased the Court. I'm Mark Johnson from the California Attorney General's Office, appearing on behalf of Appellee. As the Court has touched on, this is an ADPA case which would require relief only if it could be shown that the State Court's resolution of this claim, I guess it's a hybrid Jiglio-Brady claim of some sort, the State's resolution was manifestly unreasonable, application of those cases under the facts. And viewing the record here, the District Court got it right. The State Court's determination was, if not unimpeachable, at least entirely reasonable. Taking all the allegations, well, all the facts. It's unreasonable for the State Court to believe that these witnesses were testifying simply because they had an epiphany to tell the truth, or, as counsel suggests, because they knew that they were going to get some kind of deal. You know, those of us who are on the trial court understand that most of the time, jailhouse informers testify with the expectation of getting a break. Absolutely, Your Honor. I don't question that at all. You know, and these jailhouse informants were thoroughly impeached as to that. They testified. They weren't. That was a factual credibility question for the jury. But there's – but, you know, on that point, there's simply – there's no evidence that the prosecution ever offered in any way verbally or not. Does there always have to be direct evidence? Can't the Court infer, just like in a discrimination case, there's rarely direct evidence, but we have developed an intricate body of law that allows us to make inferences for the obvious. Now, isn't it fairly obvious that these witnesses were testifying under the expectation that they would get a break? And if the judge turned a blind eye to an obvious inference, isn't that an unreasonable determination of the facts under AEDPA? No, Your Honor. Your Honor, it's not – and may I distinguish these bouts and sort of situations? I think it's what the Court's driving at here. You know, a deal – well, there's a couple of different responses for this. I mean, if there was some sort of a deal, the question here is not what the defendants may have hoped for in anticipation of their testimony. You mean the informers may have hoped for it? Yeah. It's – the question is whether there was some sort of communication to them, whether they had a basis to expect that, and whether it was something that the prosecution had given them. And on this point – and here's where inferences that might be drawn in a Batson context are quite different from these, because for such a deal to have taken form, one would expect that the witnesses' attorneys would have had to be involved. And if it was a deal concerning sentencing, that the courtroom – or that the sentencing judge would have had to have had some knowledge of this, too. So we're not just talking about some sense of an inference that might be drawn here from the subjective expectations of these witnesses. We're basically talking about what would amount to a criminal conspiracy among the prosecution, the witnesses, probably the defense attorneys, and probably the judges. It would be very difficult to cabin the new rule that your co-counsel would like us to create, would it not? I can't even imagine how one would articulate it, but that's just me. Maybe I don't have the imagination. I'd like to change the subject a little bit here. There was an allegation, as you know, by juror number 10, that she was in effect held captive in the jury room by the foreman who blocked her way from leaving. That means you want to go talk to the trial judge to indicate that there was, I assume, a deadlock. Would you address that? Is that – how much of a problem is that? Well, to the extent that under the circumstances available at the time that to a neutral observer, one could view – I guess it was a jury foreman who – now, he certainly didn't prevent her from leaving the room, but I suppose the allegation is he stood between the juror and the doorway in a way to suggest that she might not be free to leave. The State court, again, going back to ADPA, reasonably found that even if this did present some sort of form of intimidation, that was insufficient to create a due process violation warranting a new trial. How well of deference do we owe the superior court's determination? The deference mandated under the ADPA whether it was reasonable to find under the facts here that there wasn't a due process violation. So it's the unreasonable application. Yes. Yes, Your Honor. And just on that point, a quick point I might add, what the superior court really – the one – was that shortly after this event, as the court probably is aware, the jury took a recess. Juror number 10 was free to go and come as she wanted to. She wasn't impeded in any way during that recess, and she didn't inform the bailiff or anything like that. She came back, changed her mind, and voted guilty. So there – it's almost impossible to find any causal connection between these two events. You also have juror number 11 who gave an affidavit that basically backed up what the court ultimately found. Is this – are we just talking about a weighing issue here and the trial court, the state trial court was entitled to make that decision, and we owe it deference? Well, yes. If you're referring to the corroborating – Correct. Juror. Concerning the – The ability to exit. Yeah. Yeah. It's – right. It's a weight determination, and the trial court and habeas review found that, well, these were the facts, as you know, and they weren't disputed by the complaining juror, I suppose, either. So it was a reasonable factual determination. That's owed deference. And I gather that at the time that the determination was made, the verdict was handed down that juror number 10 did not raise any questions or object or respond to any questions that she'd been threatened or anything of that nature. That's right, and in this case, the jurors were actually – it's one of those cases where the defense actually went through the motion of having the jurors individually pulled as their verdict and whether the verdict was true and correct. Counsel, I wanted to ask you a question about that specific element in light of Judge Smith's questions to you earlier. What significance, if any, on this issue of juror coercion is drawn from the fact that she was pulled? She was pulled after the jury verdict and didn't indicate any reservation at that time. Does that have significance for the issue of jury misconduct or not? Well, I think that that fact adds weight to the state court's determination that whatever may have occurred, that did not influence or coerce the juror's ultimate verdict because the juror was asked, is this your true and correct verdict? If she had, you know, been coerced into making a verdict against her will, presumably she would have not answered the question in that fashion. So it goes – it adds weight to the reasonableness of the state court's determination. Okay, thank you. Is there any further questions? I don't think so. Thank you, Counsel. Thank you, Your Honor. Ms. Weafel, do you want to – we'll give you a minute to respond here, okay? Well, on both of these issues, the jailhouse informant and the jury coercion issue, there should have been an evidentiary hearing. The fact that the juror, when she was pulled, did not speak up and say what happened, really I don't think reasonable and fair-minded jurors can make assumptions about that because she came forward afterwards. If she was really intimidated by what happened, physically intimidated, it makes perfect sense that she would not say anything until the trial was over. And, therefore, the United States Supreme Court has said that evidentiary hearings are the means to resolve all of this. Notwithstanding pinholster. And the last thing I wanted to say is that I'm not asking the Court to make new law. We're talking about all of this, the evidence, is a link in the chain of the evidence. It's circumstantial evidence that the Constitution was violated. We'll call it the wink and nod exception. Yes. Thank you both for your argument. The Pinhella v. Marshall is submitted.
judges: Marbley, Gould, Smith M.